Francesco Paolo Coppola, known as Frank P. Coppola v. Commissioner.
Coppola v. Commissioner
Docket No. 17396.
United States Tax Court
1951 Tax Ct. Memo LEXIS 318; 10 T.C.M. (CCH) 223; T.C.M. (RIA) 51066; February 28, 1951
*318 William B. Springer, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Deficiencies in income tax and penalties were determined by respondent for the years and in the amounts as follows: 50% Fraud
Year
Deficiencies
Penalty
1943
$1,972.74
$986.37
1944
1,322.40
661.11
1945
2,772.75 all of which were placed in issue by the petition herein. When the case was called for hearing, there being no appearance on behalf of petitioner, respondent's motion that a decision for the full amount of the deficiencies be entered was granted, and evidence was received in order to permit respondent to sustain his burden of showing fraud. Findings of Fact Petitioner is an alien, born in Italy on October 6, 1899. In 1926 petitioner without an immigration visa entered the United States illegally, having been smuggled in at some place in Florida from Cuba. Petitioner was deported from the United States on January 9, 1948. The warrant of the Immigration and Naturalization Service for his arrest was based on illegal entry into the United States in 1926. Petitioner reentered the United States without permission after *319 his deportation in January of 1948. A warrant was issued on December 29, 1948, for his arrest in deporation proceedings. He was arrested in Kansas City, Missouri, and was permitted to depart voluntarily from the United States on June 2, 1949, without further proceedings. Prior to 1938 petitioner used numerous aliases. He has a lengthy police record. In 1931 petitioner, in an attempt to become a citizen of the United States, filed a declaration in the State of California. He was indicted and charged with making a false statement and impersonating another in the declaration in attempting to secure his citizenship. The case was on the docket of the United States District Court, Southern District of California. Petitioner was released on bail in March 1932 and did not appear for trial. The case was dismissed in 1934 because of its age and the unlikelihood of petitioner's capture. Petitioner's principal place of residence in the early 1940's was in Detroit, Michigan. In October of 1943 he began living in New Orleans, Louisiana. About a year later he left New Orleans and moved to Baton Rouge, Louisiana. The Intelligence Unit of the Bureau of Internal Revenue, New Orleans, Louisiana, *320 received information from several sources, the principal source being the Immigration and Naturalization Service in New Orleans, that petitioner was apparently possessed of "excessive" income and that he was a "free spender." Special Agent Charles M. Nugent of the Intelligence Unit of the Bureau of Internal Revenue with office in New Orleans was assigned to investigate petitioner's income taxes for the years 1937 to 1945, inclusive. He began his investigation about the 1st of October, 1945, and worked on the case for a period of about two years. Petitioner filed a Federal income tax return for the calendar year 1943 under the name of Frank P. Coppola, 15503 Baylis Ave., Detroit, Michigan, with the collector of internal revenue for the district of Michigan. He filed income tax returns under the name of Frank P. Coppola for the calendar years 1944 and 1945 with the collector of internal revenue for the district of Louisiana. The 1944 return carried the address of 3370 Hyacinth St., Baton Rouge, Louisiana, and the 1945 return carried the address of Baton Rouge, Louisiana. On his 1943 return petitioner reported total income of $1,311 which he designated on the return as "Various *321 Commissions." No employer's name was reported on the return. The spaces on page 1 of the return calling for petitioner's occupation and social security number were left blank. On the 1943 return petitioner claimed the following deductions in arriving at income tax net income: Contributions $30; taxes $48.80; medical and dental expenses $573.39. In Schedule H of the return for 1943 under "Medical, Dental, Etc., Expenses," the following payments were listed as actually made in 1943: To Dr. Hammer, Detroit, Michigan, $150; to Dr. Aaron, Detroit, Michigan, $150; to Mayo Bros., Minn. $185; to Dr. H. M. Smith, Detroit, Michigan, $150. On his 1943, return petitioner reported income tax net income in the amount of $658.81 and victory tax net income of $1,311. He claimed a personal exemption of $500 for a single individual and an earned income credit of $65.88. Petitioner claimed no deductions in arriving at victory tax net income, but did claim a specific exemption of of $624 for victory tax purposes. He reported total income and victory tax of $202.99 for 1943. On his 1944 return petitioner reported total income of $3,039.20. On page 3 of the return he designated the income as being *322 $1,551.70 from the partnership Louisiana Novelty Co., and $1,487.50 from "gambling profits." He did not claim itemized deductions and computed the tax under Supplement T of Chapter 1 of the Internal Revenue Code. He reported a tax of $516, the tax applicable under Supplement T to adjusted gross incomes of at least $3,000 but less than $3,050 for a taxpayer claiming one surtax exemption. The taxable income reported on petitioner's 1945 return included the following: $2,777.82 from Louisiana Novelty Co.; $2,608, "1/2 Take from Dice Game with H. C. Pope"; $3,000, "Winning in Dice Game"; and $2,925, "Various winnings in Gambling." Petitioner did not cooperate with the special agent during his investigation. When Special Agent Nugent first contacted petitioner in the investigation petitioner refused to disclose the source of his income, his employers, if any, or his occupation. Despite the fact the investigation was conducted over a period of approximately two years and petitioner was interviewed on several occasions by the special agent, petitioner never would tell who his associates were, exactly what he did or how he made his money, except that he would admit that items shown on *323 his return were certain disclosures. Petitioner stated to the special agent that while he was living in Detroit he would buy produce, olive oil, cheese and various products of that nature from peddlers in Detroit which he in turn would peddle on the streets. He asserted that his income in years prior to 1943 was very meager and that he resorted to the peddling of those items to earn a living. The special agent asked petitioner for books and records of his income, deductions and disbursements for the years 1937 through 1945 and petitioner did not produce any. Petitioner stated to the special agent that he had never maintained records, that he knew nothing about records, and it had never been his practice to be concerned with keeping records of what he did. The special agent attempted to identify the source of the $1,311 reported on the 1943 return under the designation of "Various Commissions." Petitioner would not disclose the source. The special agent asked petitioner to disclose the source of the "Various Commisions" and the only explanation petitioner would make was that he did various things for people and received these commissions. The special agent attempted to verify *324 the amount of $1,487.50 reported on the 1944 return under "Gambling profits." He was unable to do so; petitioner had no records. The special agent asked petitioner the source of the gambling profits reported in the 1944 return and petitioner would not state with whom he gambled, or where, or how he made the $1,487.50, other than that he made it gambling. In early October 1944 petitioner, H. C. Pope, and Martin Tortorich formed a partnership and began operation under the name of Louisiana Novelty Company, Baton Rouge, Louisiana. Petitioner in 1944 paid $5,000 in cash for his one-third interest in the partnership. The partnership was in existence at the end of 1944. The income of Louisiana Novelty Company consisted primarily of the partnership's take from the operation of legal and illegal pinball machines and slot machines in and around Baton Rouge, Louisiana. The special agent examined the records of the Louisiana Novelty Company for the year 1944 and the income as shown therein was not subject to verification. The gross receipts of the firm could not be verified because the special agent found on contacting the various locations where the machines were in operation that the locations *325 had machines that belonged to the Louisiana Novelty Company and to other companies in Baton Rouge and that the records of the locations reflected their total take from all machines and not the take applicable to Louisiana Novelty Company machines. Petitioner filed no income tax returns for any year prior to 1942. He filed a return for 1942 with the collector in Detroit, Michigan. The special agent's investigation disclosed the following income for petitioner for the years 1937 through 1942: Wages from Detroit Italian Bakery, Detroit, Michigan, $1,295.83 in 1937; $1,282.32 in 1938; $1,299.98 in 1939; and $425 in 1942. The investigation did not disclose any wages paid to petitioner by Detroit Italian Bakery during the years 1940, 1941, 1943, and 1944. The special agent's investigation disclosed only one bank account for petitioner for the years 1937 through 1943. That account was opened in June 1939 with the Bank of Hamtramck, Michigan, with a deposit of $553. The amount was closed with a withdrawal of $508 on May 20, 1941. The account showed seven deposits and four withdrawals. The largest deposit was $1,000 and the largest balance at any one time was $1,888. As of January 1, 1943, petitioner *326 owned Series E savings bonds which cost him $900 and an interest in the Detroit Italian Bakery which cost him $1,977.59. The special agent's investigation disclosed no other assets or liabilities as of January 1, 1943. The bonds and the interest in Detroit Italian Bakery were still owned by petitioner after December 31, 1944. As of December 31, 1943, and January 1, 1944, petitioner owned the aforementioned Series E bonds and interest in Detroit Italian Bakery. On those dates he also owned insurance policy No. 53214 issued March 3, 1943, on a 20-year endowment plan in the amount of $5,000, and insurance policy No. 53297 issued March 19, 1943, in the amount of $5,000 in a single premium 15-year endowment plan. The policies were issued by Rockford Life Insurance Company, Rockford, Illinois, and petitioner still owned them after December 31, 1944. The special agent's investigation disclosed no assets as of December 31, 1943, and January 1, 1944, other than the Series E bonds, the interest in the Detroit Italian Bakery, and the insurance policies. The special agent's investigation disclosed no evidence of any indebtedness due to petitioner on December 31, 1942, or on December 31, 1943. His *327 investigation disclosed that petitioner received no property or cash in 1943 or 1944 by gift or inheritance. His investigation disclosed no evidence of borrowings by petitioner in 1943. Also the special agent's investigation disclosed no borrowings by petitioner in 1944, except loans of $1,500 made to him by J. S. Waterman, Jr., 4100 Vincennes Place, New Orleans, Louisiana, in January and February of 1944. The $1,500 in loans were repaid to Waterman by petitioner in May of 1944. In 1944 petitioner had a checking account with Louisiana National Bank, Baton Rouge, Louisiana, in which he made an opening deposit of $200 on August 31, 1944, and deposited an additional amount of $1,250 thereafter in 1944. The balance in the account at the end of 1944 was $82.79. The special agent's investigation did not disclose any other bank accounts for petitioner for the year 1944. In view of the absence of records and petitioner's refusal to cooperate, the special agent and respondent determined petitioner's taxable income for the calendar year 1943 on the basis of the aggregate known disbursements made by petitioner during the year with funds the source of which had not been identified, plus an *328 estimated amount for living expenses. During the calendar year 1943 petitioner made the following disbursements: Insurance premiums
$3,531.00
Medical expenses
627.28
Contributions
30.00
Taxes (other than Federal income)
48.80
Federal income tax (1942 paid in 1943)
101.00
Living expenses
4,000.00
Total
$8,338.00
The living expenses of $4,000 for 1943 were estimated by the special agent upon information obtained from acquaintances of petitioner who knew him and associated with him in 1943. H. S. Gossage, agent in charge, Bureau of Narcotics, New Orleans, Louisiana, who had petitioner under surveillance in 1943 told the special agent that petitioner was always a free spender, had plenty of money, and displayed himself as one possessed of ample income. In June of 1943, Gossage arrested petitioner at the Bienville Hotel in New Orleans at which time petitioner stated that he came to New Orleans for one day to attend a funeral. When asked by Gossage why he had numerous articles of wearing apparel in his luggage if he had come to New Orleans for only a day, petitioner told him he was extravagant and liked to change clothes frequently. Gossage searched petitioner *329 in his room at the Bienville Hotel and found 1,400 and some dollars in United States currency in his possession, which petitioner stated was his money and that he had won it gambling. Mr. J. S. Waterman, Jr., a clothing manufacturer in New Orleans, told the special agent that he had known petitioner for several years, and that in 1943 prior to October, petitioner made several trips from Detroit to New Orleans to visit various friends and associates of his; that on these visits petitioner dined and entertained his friends, and that petitioner always selected the better places and always seemed to have unlimited cash. Respondent considered the total known disbursements in 1943, plus estimated living expenses of $4,000 as total taxable income for 1943. Respondent allowed the deductions claimed by petitioner on his 1943 return for contributions and taxes. Respondent allowed a medical expense deduction in the amount of $214.32, computed by starting with medical expense disbursements of $627.28 and allowing the excess of that amount over 5 per cent of the difference between total income of $8,338 and the deductions allowed for contributions and taxes. Respondent allowed a personal exemption *330 of $500 and an earned income credit of $300. For victory tax purposes respondent allowed a specific exemption of $624. In view of the absence of records and petitioner's refusal to cooperate, the special agent and respondent determined petitioner's taxable income for the calendar year 1944 on the basis of the aggregate known disbursements made by petitioner during the year with funds the source of which had not been identified, plus cash in bank on December 31, 1944, in the amount of $82.79 and an estimated amount for living expenses in the amount of $5,000. During the calendar year 1944 petitioner made the following disbursements: Payments on real estate (residence)
$ 5,360.00
Investments in Terrebonne Fish and
Oyster Co.
800.00
Investment in Louisiana Novelty Co.
5,000.00
Cost of furniture purchased
1,339.68
Cost of improvements to real estate
805.26
Insurance premium
231.00
Medical expenses
256.24
Federal income tax (1943 paid in
1944)
101.99
Living expenses
5,000.00
Total (exclusive of $82.79 balance in
Louisiana National Bank at end
of 1944)
$18,894.17
The investment in the Terrebonne Fish and Oyster Company in the amount of $800 is *331 a net amount. In March 1944 Coppola gave J. S. Waterman, Jr., $4,200 in currency for an interest in the Company. Petitioner was indebted at the time to Waterman in the amount of $1,500. About 60 days after petitioner acquired the interest in the Company he asked that his money be returned. In May of 1944 Waterman deducted the $1,500 debt of petitioner from the $4,200 and returned to petitioner $1,400 of the $4,200 investment. In June 1944 another $500 of petitioner's investment was returned, leaving $800 due petitioner. The $800 was not returned until 1945. The living expenses of $5,000 for 1944 were estimated by the special agent upon information obtained from acquaintances of petitioner with respect to his free spending and extravagant proclivities. In raising the amount $1,000 over that estimated for 1943, the special agent took into consideration the fact that petitioner in August of 1944 purchased a residence in Baton Rouge, Louisiana, for $13,000 which he remodeled with bars and barbecue pits. Respondent determined the total known disbursements in 1944 plus estimated living expenses of $5,000 and bank balance at the end of 1944 in the amount of $82.79 as total taxable income *332 for 1944. Respondent allowed petitioner the standard deduction of $500. Respondent allowed surtax exemption of $500 and normal tax exemption of $500. The attorneys who signed the petition in this case were Richard P. Shanahan, 711 Commerce Building, Kansas City, Missouri, and James J. Waters, 712 Commerce Building, Kansas City, Missouri. Waters filed an entry of appearance on March 8, 1948, and Shanahan filed one on March 15, 1948. On May 2, 1950, Waters filed a motion to withdraw from the case and the motion was granted May 8, 1950. On May 8, 1950, the case was continued from the Tax Court calendar on May 8, 1950, in Kansas City, Missouri, to the next calendar at Kansas City. Paragraph 1 of the petition states in part that petitioner "formerly was a resident of Kansas City, Missouri, c/o Pickwick Hotel, and his present mailing address in the United States is 711 Commerce Building, c/o Richard P. Shanahan, his attorney in fact." That was admitted in paragraph 1 of the answer. The deficiency notice was mailed to petitioner at 711 Commerce Building, Kansas City, Missouri, and a copy was mailed to Shanahan at that address. Notices of the November 13, 1950, hearings of the Tax Court *333 calendar in Kansas City were sent to petitioner at the following addresses Kansas City, Missouri. (b) Pickwick Hotel, Kansas City, Missouri. (c) 15503 Baylis Ave., Detroit, Michigan. (d) 3370 Hyacinth St., Baton Rouge, Louisiana. Notices of the hearings were also sent to Richard P. Shanahan, 711 Commerce Building, Kansas City, Missouri, and A. B. Mitchell, National Bank of Topeka Building, Topeka, Kansas. Before the May 8, 1950, Tax Court hearing in Kansas City, Missouri, respondent's attorney, William B. Springer, called Shanahan on the telephone and he announced he no longer had any interest in the case. On November 9, 1950, Shanahan called Springer on the telephone and Springer at that time told Shanahan that the Government was "going ahead with the case." When the case called on the November 13, 1950, calendar, there was no appearance for petitioner at the calendar call or the hearing. Petitioner's total taxable income, his net income, and the correct tax for the calendar years 1943 and 1944 are as follows: Total Taxable
Year
Income
Net Income
Tax
1943
$ 8,338.00
Income Tax -
$ 8,044.88
$2,074.73 (combined income and victory tax)
Victory Tax -
8,338.00
1944
18,976.96
18,476.96
6,727.79
*334 Petitioner knowingly and wilfully filed false and fraudulent income tax returns for each of the calendar years 1943 and 1944, with intent to defeat and evade Federal income and victory taxes. Petitioner's understatement in taxable income for each of the calendar years 1943 and 1944 was knowingly and wilfully made by him with intent to evade Federal income and victory taxes and for the purpose of understating the amount of his taxable income and the amount of his Federal tax liability for each of the years 1943 and 1944, and a part of the deficiencies for each of such years is due to fraud with intent to evade tax. Opinion Our ultimate finding that some part of the deficiencies for each of the years 1943 and 1944 was due to fraud with intent to evade tax disposes of the only issue as to which evidence was heard, the deficiencies themselves being approved for failure on the part of petitioner to sustain his burden of proof. Decision will be entered for the respondent.